UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

In the Matter of Arbitration Between:

VULCAN ENERGY SOLUTIONS, L.L.C.,

                   Petitioner,

          - and -

MINISTRY OF ELECTRICITY OF THE REPUBLIC OF
IRAQ,

              Respondent.

------------------------------------------------------- X

08 CV 3668

(Supreme Court of the State
of New York, County of
New York
Index No. 6008976/08)

NOTICE OF REMOVAL



PLEASE TAKE NOTICE that the above-captioned petition is hereby removed from the Supreme Court of the State of New York, in and for New York County, to the United States District Court for the Southern District of New York. This removal is based on the following facts and authority:

<u>Background</u>

     1.     On March 26, 2008, Petitioner, Vulcan Energy Solutions L.L.C. ("Vulcan"), filed the above-referenced Petition to Confirm Arbitration Award ("the Petition") in the Supreme Court of the State of New York, in and for New York County, Index No. 600897/08, against the Respondent, the Ministry of Electricity of the Republic of Iraq (the "Ministry").

     2.     Pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16, Vulcan, albeit it was the losing party in the arbitration, seeks to confirm the Final Award of the Sole Arbitrator dated March 28, 2007 (the "Final Award"), and the Disposition of Vulcan's Application for Completion and Clarification of the Final Award dated May 10, 2007 (the "Clarification

Decision," and, together with the Final Award, the "Arbitration Award") rendered in <u>Vulcan</u>

<u>Energy Solutions LLC vs. Ministry of Electricity of the Republic of Iraq</u>, Case No. 50 198 T

00441 05, an arbitration conducted in New York City under the Rules of the International Centre

for Dispute Resolution of the American Arbitration Association.  In the Final Award, the

arbitrator rejected all of Vulcan's claims for damages under its contract with the Ministry and

ruled that the Ministry had not breached the contract.  In the Clarification Decision, the arbitrator

held that the Final Award was unambiguous and did not warrant reconsideration or clarification.

3.      The Ministry is a "foreign state" within the meaning of the Foreign

Sovereign Immunities Act.  <u>See</u> 28 U.S.C. § 1603(a); Petition ¶ 4.

Grounds for Removal

4.      28 U.S.C. § 1330(a) vests in the United States district courts original

jurisdiction over actions against foreign states:

> [t]he district courts shall have original jurisdiction without regard
> to amount in controversy of any nonjury civil action against a
> foreign state as defined in section 1603(a) of this title as to any
> claim for relief in personam with respect to which the foreign state
> is not entitled to immunity either under sections 1605-1607 of this
> title or under any applicable international agreement.

5.      Under 28 U.S.C. § 1605(a)(6)(A), the types of actions in which a foreign

state is not entitled to immunity include actions brought to confirm an arbitral award where the

arbitration takes place in the United States.

6.      This action thus falls within the jurisdiction of this Court and may be

removed pursuant to 28 U.S.C. § 1441(d), which provides:

> [a]ny civil action brought in a State court against a foreign state as
> defined in section 1603(a) of this title may be removed by the
> foreign state to the district court of the United States for the district
> and division embracing the place where such action is pending.
> Upon removal the action shall be tried by the court without jury.

7.    Attached hereto as Exhibit A is a copy of all filings in the State Court proceeding pursuant to 28 USC §1446(a).

<u>Notice and Filing</u>

8.    The petitioner has been provided notice of the removal of this action as required by 28 U.S.C. § 1446(d).

9.    A copy of this Notice of Removal will be filed with the Supreme Court of the State of New York, in and for New York County.

Dated: New York, New York
          April 16, 2008

                              CLEARY GOTTLIEB STEEN & HAMILTON LLP

                              By: _____
                                   Jonathan I. Blackman (JB 3846)

                              One Liberty Plaza
                              New York, New York 10006
                              (212) 225-2000

                              Attorneys for The Ministry of Electricity of the
                              Republic of Iraq

TO:    T. Michael Guiffre
       Benjamin G. Chew
       Gordell A. Hull
       PATTON BOGGS LLP
       2550 M Street, N.W.
       Washington, D.C. 20037
       (202) 457-6000

       Attorneys for Petitioner

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------x
                                        :

In the Matter of Arbitration Between:     :

VULCAN ENERGY SOLUTIONS, LLC,     :

                       *Petitioner*,   :

          - and -             :

MINISTRY OF ELECTRICITY OF THE
REPUBLIC OF IRAQ,             :

                     *Respondent*.   :
------------------------------------------------x

Index No. *600897/08*
*Date Purchased· 3/26/08*

## NOTICE OF PETITION TO CONFIRM ARBITRATION AWARD

PLEASE TAKE NOTICE that upon the annexed Petition of Vulcan Energy Solutions,

LLC and the Affirmation of T. Michael Guiffré, the undersigned counsel will petition this Court

at the Courthouse, Supreme Court, New York County, located at 60 Centre Street, New York,

New York, Room 130, on the 30th day of April, 2008, at 9:30 a.m., or as soon thereafter as

counsel may be heard, for an order: (a) confirming the arbitration decisions in this matter; and

(b) for such other and further relief as to the Court may seem just and proper.

Respectfully submitted,

Dated: March 26, 2008
         Washington, D.C.

T. Michael Guiffré
Benjamin G. Chew
Cordell A. Hull
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C.  20037
(202) 457-6000 – Telephone
(202) 457-6315 – Facsimile

*Counsel for Petitioner*
*Vulcan Energy Solutions, LLC*

.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

————————————————————————x
                             :

In the Matter of Arbitration Between:     :

VULCAN ENERGY SOLUTIONS, LLC,    :
                             :

                 *Petitioner,*     :     Index No.

        - and -           :

MINISTRY OF ELECTRICITY OF THE   :
REPUBLIC OF IRAQ,            :

               *Respondent.*   :
————————————————————————x

## **PETITION TO CONFIRM ARBITRATION AWARD**

       Petitioner Vulcan Energy Solutions, LLC ("Vulcan"), through its undersigned counsel, alleges as follows:

### **Nature of the Proceeding and Relief Sought**

       1.    Vulcan commences this proceeding under N.Y. C.P.L.R. § 7510 and the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), to confirm a duly-rendered arbitration award (the "Arbitration Award," as further defined below) issued in an arbitration between Vulcan and Respondent Ministry of Electricity of the Republic of Iraq ("the MOE").

       2.    The Arbitration Award was issued pursuant to the arbitration provisions of the February 22, 2005 Power Rehabilitation Contract ("the Contract") between Vulcan and the MOE. A copy of the Contract is attached as Exhibit A to the Affirmation of T. Michael Guiffré, dated March 25, 2008 (the "Guiffré Aff."), which is being filed concurrently herewith.

1

## Parties

3.      Vulcan is a limited liability corporation organized and existing under the laws of Delaware, with its principal place of business in Elizabethtown, North Carolina.

4.      Upon information and belief, the MOE is an arm of the government of the Republic of Iraq, with its principal place of business in Baghdad, Republic of Iraq.

## Jurisdiction and Venue

5.      This proceeding is commenced within one year from the date of the award. *See* N.Y. C.P.L.R. § 7510. On March 28, 2007, the arbitrator issued his initial arbitration decision, titled "Final Award of Sole Arbitrator" (the "Final Award"). The arbitrator issued a subsequent decision on May 10, 2007, titled "Disposition of Application for Completion and Clarification of the Final Award" (the "Clarification Decision") (collectively with the Final Award, the "Arbitration Award"). Copies of both arbitration decisions are attached as Exhibits B and C, respectively, to the Guiffré Affirmation and made a part hereof.

6.      This Court has personal jurisdiction over the MOE because the Contract specifies that any disputes arising thereunder would be settled according to U.S. law in the State of New York. Additionally, the MOE participated in arbitral proceedings that included three days of hearings in New York City.

7.      Venue is proper in this Court because the arbitration proceedings were held in New York County. *See* N.Y. C.P.L.R. § 7502(a)(i) ("The proceeding shall be brought in the court and county . . . where the arbitration was held.").

## Facts

8.      The parties entered into the Contract on February 22, 2005. The Contract provided that Vulcan would refurbish several electricity generators at a power generation plant in Iraq for the MOE.

2

9.      As consideration for the work, the MOE was to pay Vulcan fees not to exceed $64 million. *See* Guiffré Aff., Exh. A § 8.1.

10.     The Contract further provided that the parties would settle all disputes by binding arbitration in accordance with the rules promulgated by the American Arbitration Association. Specifically, the Contract provided that:

> Any disputes arising out of this Contract shall be construed and interpreted according to the United States Law in the State of New York as applicable, excluding provisions thereof, which would refer to the laws of another body of law. In the event of a dispute, each party agrees to binding arbitration under the rules of the American Arbitration Association in New York, New York.

Guiffré Aff., Exh. A § 23.0.

11.     After the parties entered into the Contract, the parties disputed Vulcan's entitlement to a mobilization payment of more than $12 million.

12.     Pursuant to the terms of the Contract, in January 2006, the parties conducted binding arbitration before a sole arbitrator, Judge Stephen M. Schwebel. The hearing took place and the award was made in New York City. *See* Guiffré Aff., Exh. B ¶¶ 3 & 41.

13.     During the arbitration, the parties exchanged documents, submitted pre-hearing briefs and witness statements, called witnesses during the hearing, and submitted post-hearing briefs. *See* Guiffré Aff., Exh. B ¶ 3.

14.     The hearing took place from February 5-8, 2007 in New York City. *See* Guiffré Aff., Exh. B ¶ 3.

15.     On March 28, 2007, the arbitrator issued the Final Award. The arbitrator concluded, in relevant part, that:

> (A)     "[T]he [C]ontract cannot be set aside on the ground that it was procured by bribery." Guiffré Aff., Exh. B ¶ 30;

3

(B)     The MOE "cannot now be heard to avoid the contract on the ground of the lack of authority of [its agent] to conclude it." *Id.* at ¶ 33; and

(C)     Vulcan did not establish "that the [MOE] was in breach of the [C]ontract by its treatment of payment of the mobilization fee." *Id.* at ¶ 38.

16.     On May 10, 2007, the arbitrator issued the Clarification Decision, holding that the Final Award was unambiguous and did not warrant reconsideration or clarification. *See generally* Guiffré Aff., Exh. C.

**Claim for Relief**
(Confirmation of Arbitration Award Pursuant to N.Y. C.P.L.R. § 7510; and 9 U.S.C. § 9)

17.     Petitioner repeats and realleges the allegations in paragraphs 1-16 as if set forth fully herein.

18.     The Contract is an "agreement in writing" within the meaning of the FAA and the C.P.L.R. *See* 9 U.S.C. § 2; N.Y. C.P.L.R. § 7501.

19.     The Contract is a "contract evidencing a transaction involving commerce" within the meaning of the FAA. *See* 9 U.S.C. § 2.

20.     The parties agreed that the decision of the arbitrator would be binding on them. *See* Guiffré Aff., Exh. A § 23.0.

21.     This proceeding to confirm the Arbitration Award is brought within the one-year period specified in the C.P.L.R. *See* N.Y. C.P.L.R. § 7510.

22.     The arbitration hearings occurred in this county. *See* Guiffré Aff., Exh. A, Certification; N.Y. C.P.L.R. § 7502(a)(i).

23.     None of the grounds for vacatur, modification, or correction apply to the Arbitration Award. *See* N.Y. C.P.L.R. § 7511; 9 U.S.C § 10.

4

24.    The award is therefore required to be confirmed pursuant N.Y. C.P.L.R. § 7510 and 9 U.S.C. § 9.

### Conclusion

WHEREFORE, Vulcan prays:

(A)    That this Court enter judgment pursuant to N.Y. C.P.L.R. §§ 7510 & 7514 and 9 U.S.C. § 9 confirming the Arbitration Award; and

(B)    That Vulcan be awarded such other and further relief as may be proper.

Respectfully submitted,

Dated: March 26 , 2008
      Washington, D.C.

T. Michael Guiffré
Benjamin G. Chew
Cordell A. Hull
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C.  20037
(202) 457-6000 – Telephone
(202) 457-6315 – Facsimile

*Counsel for Petitioner*
*Vulcan Energy Solutions, LLC*

5

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

―――――――――――――――――――――x

In the Matter of Arbitration Between:

VULCAN ENERGY SOLUTIONS, LLC,

                     *Petitioner*,

        - and -

MINISTRY OF ELECTRICITY OF THE
REPUBLIC OF IRAQ,

                    *Respondent*.

―――――――――――――――――――――x

Index No. 600897 /08
Date Purchased: 3/26/08
AFFIRMATION OF
T. MICHAEL GUIFFRÉ
IN SUPPORT OF PETITON
TO CONFIRM ARBITRATION
AWARD

       I, T. Michael Guiffré, affirm, under the penalties of perjury pursuant to C.P.L.R. § 2106, the following:

       1.     I am an attorney admitted to practice before the courts of the State of New York and a member of the firm Patton Boggs LLP. I am counsel for Petitioner Vulcan Energy Solutions, LLC in this proceeding.

       2.     Attached hereto as **Exhibit A** is a true and correct copy of the February 22, 2005 Power Rehabilitation Contract between Vulcan and the Ministry of Electricity of the Republic of Iraq, which contains the parties' agreement to arbitrate.

       3.     Attached hereto as **Exhibit B** is a true and correct copy of the "Final Award of Sole Arbitrator" issued on March 28, 2007.

       4.     Attached hereto as **Exhibit C** is a true and correct copy of the "Disposition of Application for Completion and Clarification of the Final Award" issued on May 10, 2007.

5.    No prior request has been made in this or any other Court for the relief requested

herein.

Dated: March 25, 2008
       Washington, D.C.            T. Michael Guiffre

Subscribed and sworn to before me, in my presence, this
25th day of march , 2008, a Notary Public
in and for the District of Columbia
Margaret E. Nammen
           Notary Public
My commission expires march 14 , 20 10

4946561                                    2

# EXHIBIT A

| VULCAN ENERGY SOLUTIONS, LLC | TECHNICAL SERVICES AGREEMENT |
|---|---|
| MINISTRY OF ELECTRICTY - TASK ORDER | February 21, 2005 |
| IRAQ POWER REHABILITATION | Contract: VES-050127-01B-FINAL1 |

# POWER REHABILITATION CONTRACT

## MULLA ABDULLA SITE

### PART I — PARTIES TO CONTRACT

It is agreed this day of February 21, 2005 by and between the Ministry of Electricity for Iraq (hereinafter referred to as "MOE"), whose address is:

Republic of Iraq
Ministry of Electricity
Baghdad Iraq

and Vulcan Energy Solutions L.L.C (hereinafter referred to as Contractor), whose address is.

Vulcan Energy Solutions L.L.C
664 Ben Greene Industrial Park Road
Elizabethtown, NC 28337
Phone: 910.862.4444 or 212.980.8520
Fax: 910.862.6014 or 212.980.9510

And whose U.S. Federal Tax ID Number is **36-4563749**.

In consideration of the agreements herein contained, the parties hereto agree as follows:

### PART II — SCOPE OF SERVICES

### 1.0    DESCRIPTION

Contractor shall supply all labor as required to perform the Supervisory Services as described below, hereinafter referred to as the "Services," for and in connection with the prime contract provided by the MOE, hereinafter referred to as Owner.

## Mulla Abdulla General Scope of Work:

### 2.0    **2.1 MAJOR PARTS:**

- Complete in-shop refurbishment of six (6) Turbine and Compressor Rotors. This is to include new blades both rotating and stationary. If replacement or excessive in-shop repair is required for the additional six (6) Turbine and Compressor Rotors, the shop repair cost or replacement cost will be an additional charge of cost plus

| **VULCAN ENERGY SOLUTIONS, LLC** | **TECHNICAL SERVICES AGREEMENT** |
|---|---|
| **MINISTRY OF ELECTRICTY - TASK ORDER** | **February 21, 2005** |
| **IRAQ POWER REHABILITATION** | **Contract: VES-050127-01B-FINAL1** |

12% or MOE may reserve the right to supply replacement rotor from it's current spare parts inventory.
- Replacement of six (6) Compressor Section Stationary Blades. If replacement of the additional six (6) is required, the replacement cost will be an additional charge of cost plus 12% or MOE may reserve the right to supply replacement Stationary Blades from it's current spare parts inventory.
- Replacement of 1st and 2nd Stage Nozzles and Shrouds.
- Replacement of Cans, Liners, Transition Pieces, and Cross Fire Tubes.
- Refurbishment of IGV Actuator, Gears, Segments, and Pins. Bushings will be replaced.
- Installation of new Thermocouples.
- Replacement of Fuel Nozzles.
- Refurbishment of Exhaust Panels. New insulation and expansion will be installed if required.
- Miscellaneous Consumable Parts (ie: bolting, gaskets, seals, nuts, anti-seizes, shims, fittings, etc.) will be provided.
- Install New Lube Oil after High Velocity Flush and Complete Lube System Cleaning.
- Install New Bird Screen on Inlet Air Duct.

### 2.2 Additional Parts:
- Refurbishment of Fen-Fan Coolers. This includes new impellers, bushings, bearings, and shafts for pumps.
- Refurbishment of Atomizing Air System.
- Refurbishment of Starting Motors and Torque Converters. This includes complete rebuild kits for diesel starting motors.
- Replace Labyrinth Seals.
- Refurbishment of all bearings and oil deflectors.
- Refurbishment of Accessory Gear Box.
- Refurbishment of Fuel Oil System.
- Refurbishment of Exhaust System. (Including Diffuser, Silencers, and Stack)
- Refurbishment of Hydraulic and Control Oil System.
- Refurbishment of Lube Oil Pumps.
- Refurbishment of Fuel Gas System.
- Refurbish Over Speed Trip Equipment.
- Refurbishment of Load Gear Box.

### 3. Instrument Parts:
- New Pressure Switches (On Base).
- New Temperature Switches (On Base)
- Refurbishment of Solenoid Valves. (Replacement of Solenoids when required).
- Refurbishment of all Valves from Gas and Fuel Manifold to unit as well as all Hydraulic and Control Valves.
- Refurbishment of Ratchet System.
- Replacement of oil and fuel level gauges.
- Refurbishment of all purge and check valves.
- Installation of new "block and bleed" valves as determined necessary by Site Manager.

| VULCAN ENERGY SOLUTIONS, LLC | TECHNICAL SERVICES AGREEMENT |
|---|---|
| MINISTRY OF ELECTRICTY - TASK ORDER | February 21, 2005 |
| IRAQ POWER REHABILITATION | Contract: VES-050127-01B-FINAL1 |

### 4. Gas Fuel Skids:
- Install New Gas Filters.
- On-Site Repair of Fuel Gas Skid.
- Refurbishment of all manual valves.
- Installation of New Relief Valves.
- Refurbishment of Pressure Control Valve and Actuator.
- Replacement of Level Switch for Fuel Gas Drain System.
- Refurbishment of Slam Shut Off Valve.
- Install New Pressure and Temperature Gauges.

### 5. Electrical Parts & Generator:
#### Control Cab:
- Install new Dresser Rand or PetroTech PLC Control System. Delivery times may vary depending on Vendor chosen by MOE.
- Install New Temp. Indicator and Thermocouples. This includes complete new instrumentation and instrumentation wiring and control cables.
- Refurbish existing Generator Control Panels.
- Complete Electrical Testing on Generator.
- Install new A/C in Control Cab.
- Provide Spare PLC cards, Control relays, and Misc. fuses for new PLC.

#### Electrical Additional:
- Install Complete New Instrumentation for Turbine and Generator.
- Install new Battery Chargers and Batteries.
- Change Generator Filter.
- Inspect and Refurbish the following:
  - A- Load Gear Motor
  - B- Generator Dust Louver Motors
  - C- Turbine Dust Louver Motors
  - D- Turbine Vent Fan Motors
  - E- Ratchet Motor
  - F- Lube Oil Pump Motors
  - G- Emergency Lube Oil Pump Motor (DC)
  - H- Inlet Air Blower Motors
- Electrical Test of all CB and replace contact points.
- Electrical Test of all Unit Transformers
- Electrical all CT's and PT's
- Install new R.T.D.'s for Generator
- Refurbish Exciter Brushes and Brush Ring.
- Complete Electrical Test of Exciter.

### 6. Common Facilities:
- Refurbish Main Air Compressor System
- Refurbish Gas and Liquid Fuel System Skids.

### 7. Additional New Scope Added Without Price Increase:

| VULCAN ENERGY SOLUTIONS, LLC | TECHNICAL SERVICES AGREEMENT |
|---|---|
| MINISTRY OF ELECTRICTY - TASK ORDER | February 21, 2005 |
| IRAQ POWER REHABILITATION | Contract: VES-050127-01B-FINAL1 |

- Complete Rebuild of Diesel Starting Motors. This includes complete engine rebuild kits.
- Install New Modern Type Air Inlet Filters. This also includes one spare set for each unit.
- Replace Fire Protection Detection Devices and Piping. If new panel is required a change order will be required. Filling of Co2 bottles will be completed by MOE.
- New PLC's installed in Control Room. This includes all relevant cables required for remote operation.
- New Generator MCC's (for three units.)
- Provide two spare Diesel Starting Motors w/o Torque Converter

## 8. Tools & Devices:
- One Set of Hand Tools for Turbine/Generator Work
- Stroboscope (Digital)
- Portable Vibration Detection System.
- Hand Held Laser Temperature Gun.
- Hydraulic Pressure Tester.
- Calibrator or Pressure and Temperature Switches
- Standards for Pressure Gauges.
- Pipe Bending Machine (1/4" – 1")
- Threading Machine
- Portable Lathe
- Portable Milling Machine
- Portable Drill Press
- Alignment Equipment
- Wire Alignment Kit
- Precision Tools
- Plasma Cutter
- MIG Welder
- AC/DC Welder
- HART Communicator
- FOX-Hound Trace
- Steam Cleaner
- All Required Safety Equipment
- Parts Cleaning Stations
- NDE Inspection Equipment
- Bead Blasting Equipment
- Gas Cutting Torch Sets

## 9. Rental Equipment:
- 75 Ton Crane
- 35 Ton Crane
- JLG Lifts
- Grove Fork Lifts

## 10. Documentation & Manuals of Operation & Maintenance:
- Documentation and Training will be provided for New Control Systems.
- Training and Documentation will be provided for Plant O&M Activities.

| VULCAN ENERGY SOLUTIONS, LLC | TECHNICAL SERVICES AGREEMENT |
|---|---|
| MINISTRY OF ELECTRICTY - TASK ORDER | February 21, 2005 |
| IRAQ POWER REHABILITATION | Contract: VES-050127-01B-FINAL1 |

## 11. Training:
- Training will consist of both classroom and "hands-on" atmosphere. Training will last not longer than 6weeks and will end at the direction of Site Manger.
- Training will include total site O&M direction and modern routine maintenance schedule as to increase unit performance and reduce down time.
- Plant will be required to schedule qualified plant personnel to attend training sessions as directed by Vulcan Site Manager.

## 12. Supervision:
- EXPAT personnel will provide technical "hands-on" direction for all disassembly, refurbishment, assembly, testing, and start-up.
- The expected number of EXPAT personnel including Management is 24. This number may increase or decrease at direction of Site Manager as not to impede schedule.

## 13. Unit Performance Increase:
- Modern PLC Control System installation will increase unit availability and unit performance
- Refurbishment of Lube Oil System will reduce internal friction and increase unit performance.

## 14. Guarantee:
- Vulcan agrees to guarantee workmanship and Vulcan purchased parts and equipment for a period not exceed one (1) year. Units must be operated per Manufacture instructions and specifications or this guarantee will become null and void. For guarantee claims by MOE a copy of prior 30-day run log printed from control system historian must accompany claim to insure operation has been per manufacturer recommendations. Maintenance logs must also be provided to support any guarantee claims.
- Vulcan agrees to a per unit run capacity of 20MW at ISO. An authorized MOE representative will witness this MW output during initial start-up of each unit. After witness of 20MW output the MOE representative will sign acceptance to this agreement guarantee.
- The first four units will be back in operation within 120 days from mobilization date. The next four units will be back in operation within 180 days of mobilization. The final four units will be in operation within 210 days of mobilization.

## 3.SERVICES FURNISHED BY CONTRACTOR

The Contractor will furnish or cause to be furnished, the following items for or in connection with the performance of the Services:

**3.1.1**  Security, in transit and on-site, for personnel and equipment

**3.1.2**  Tools and parts (as specified in Work Scope) required for repair and refurbishment as per scope of work for each project site.

| VULCAN ENERGY SOLUTIONS, LLC | TECHNICAL SERVICES AGREEMENT |
|---|---|
| **MINISTRY OF ELECTRICTY - TASK ORDER** | February 21, 2005 |
| **IRAQ POWER REHABILITATION** | Contract: VES-050127-01B-FINAL1 |

    **3.1.3**  Food and lodging, in transit and on-site, for personnel while performing the scope of work noted in Section 1 above.

    **3.1.4**  Complete camp operations, security, maintenance and presence at the project sites.

    **3.1.5**  Training of Iraq engineers to operate, maintain, and trouble-shoot above stated units. This training program is not to exceed six (6) weeks and length of training is at the sole discretion Contractor.

    **3.1.6**  All shipping of parts and materials included in scope of work.

## 4.0   PERFORMANCE SCHEDULE

**4.1**    Unless otherwise agreed by MOE in writing, Contractor shall perform the Services specified, commencing the Services on or about March 15, 2005, and completing the Services not later than, 210 days from commencing, unless terminated in writing by MOE pursuant to Section 10.1 below.

**4.2**    Contractor anticipates having some units' on-line producing electricity on an expedited per project basis, and have all project sites on line per contract schedule anticipated to be approx November 10, 2005

**4.3**    Contractor will comply with the following specific milestones in connection with this Technical Services Agreement:

- Letter of Award/Notice to Proceed/Letter of Credit Received

- Mobilization to Project Sites

- Start Repairs and Rehabilitation

- Complete Repairs and Rehabilitation

- Start-up and Commissioning

- Signed Acceptance of Site by MOE

- Training

**4.4**    MOE will schedule and coordinate Contractor's Services, the work of other Contractors, according to the requirements of this Contract, and will take all steps necessary to assure that the work of other Contractors and Vulcan Energy Solutions, LLC is not unreasonably interfered with.

| VULCAN ENERGY SOLUTIONS, LLC | TECHNICAL SERVICES AGREEMENT |
|---|---|
| MINISTRY OF ELECTRICTY - TASK ORDER | February 21, 2005 |
| IRAQ POWER REHABILITATION | Contract: VES-050127-01B-FINAL1 |

**5.0    CONFLICT IN DOCUMENT**

In the event of any conflict between or ambiguities in any documents, which are a part of this Contract, identified by either party, the parties agree to work together to develop an expeditious resolution to the conflict.

**6.0    COMMUNICATIONS**

6.1    All communications and notices to MOE, pursuant to or in connection with this Contract, shall be marked with the MOE Contract Number and communicated by registered mail return receipt requested, facsimile, email, telex or cable (except for routine matters which may be sent by surface mail), to the following addresses.

MOE Address:
Ministry of Electricity
Government of Iraq
Baghdad, Iraq

6.2    All communications and notices to Vulcan Energy Solutions, LLC, pursuant to or in connection with this Contract, shall be marked with the MOE Contract Number and communicated by registered mail return receipt requested, facsimile, email, telex or cable (except for routine matters which may be sent by surface mail), to the following addresses:

Contractor Address:
Vulcan Energy Solutions, LLC
644 Ben Greene Industrial Park Road
Elizabethtown, NC  28337
Telephone: 910.862.4444 x116
Attn: Bob Virgo – Vice President, Director of Projects
email: bobvirgo@vulcanamps.com

and

Vulcan Energy Solutions, LLC
150 East 52nd Street, 11th Floor

New York, New York 10022
Telephone: 212.980.9832
Fax: 212.980.9510
Attn: Ford Graham
email: Fgraham@vulcancapital.com

6.3    In performing the Services, Contractor's primary contact with MOE shall be Bob Virgo (primary) and Ford Graham (secondary).

| | |
|---|---|
| **VULCAN ENERGY SOLUTIONS, LLC** | **TECHNICAL SERVICES AGREEMENT** |
| **MINISTRY OF ELECTRICTY - TASK ORDER** | **February 21, 2005** |
| **IRAQ POWER REHABILITATION** | **Contract: VES-050127-01B-FINAL1** |

**6.4** These names and addresses may be changed by either party by sending the other party written notice as specified in Section 4.1 above.

## 7.0 REPORTS

Contractor shall submit no less than once a month an invoice that will include a daily report activity sheet that details the services performed under this Contract. The Daily reports will be submitted to Aiser Habib the General Director Mechanical Engineer for Republic of Iraq Minister of Electricity and Mulla Abdulla Plant Manger via e-mail transmission. A weekly report will be issued to Mr. Raad Shallad via e-mail. A hard copy of daily and weekly reports will be filed on site and a copy will be delivered to Mr. Habib at successful completion of project.

## PART II — COMMERCIAL TERMS

## 8.0 COMPENSATION

### 8.1 Value

The aggregate total of all payments made to Contractor, in full compensation to Contractor for full and complete and satisfactory performance by Contractor of all the In Scope Services, compliance with all terms and conditions of this Contract, and for Contractor's payment of all obligations incurred in or applicable to performance of the Services, SHALL NOT EXCEED the Total Estimated, But Not Guaranteed, Amount of $64,000,000.00 USD.  These payments shall include all hours worked by the Contractor or his subcontractors; Vulcan purchased parts and equipment in support of this contract both in and out of Iraq.

The schedule for payments under this provision is provided in Exhibit A.  The Contractor will provide services to fulfill the contact requirements and will be paid to provide the services provided in Exhibit B.  Contractor employees in Iraq and the United States will provide these services.

At the signing of this Contract, the MOE shall deliver an irrevocable Letter of Credit issued at JP Morgan of New York in the amount of $12,200,000.00 USD to Contractor as a mobilization fee for labor and required parts. Vulcan will deliver invoices along with appropriate documentation to the MOE for payment every 30 days.

| VULCAN ENERGY SOLUTIONS, LLC | TECHNICAL SERVICES AGREEMENT |
|---|---|
| MINISTRY OF ELECTRICTY - TASK ORDER | February 21, 2005 |
| IRAQ POWER REHABILITATION | Contract: VES-050127-01B-FINAL1 |

### 8.2    Money Transfer

MOE shall deliver payment to Contractor in US Dollars by process of wire transfer. The wire transfer instructions are:

Company Name:    Vulcan Power Group, LLC
For Benefit of Vulcan Energy Solutions, LLC
150 East 52nd Street 11th Floor
New York, NY 10022
212-980-9520
Attn: Kristine Egler

Bank Name·        Citibank, N.A.
640 Fifth Avenue
New York, NY 10019
212- 541-8654
Attn: Michelle Solon Rhome
Routing/ABA Number: 021000089
BIC/SWIFT Code: CITIUS3PPBX
Account Number: 41359108
Account Name: Vulcan Power Group, LLC

### 8.3    Taxes

**8.3.1**    Contractor shall make and pay all payroll deductions required by US law, and hereby indemnifies and holds harmless MOE from any and all liability on account of any and all such US taxes, levies, duties, assessments and deductions.

**8.3.2**    Contractor will not be responsible for any excise taxes, levies, duties, assessments, deductions, or other governmental charges etc. from any Country.    With respect to any applicable taxes, duties, and assessments Imposed on Contractor, Contractor shall bill the MOE at cost for these charges.·

## PART III — GENERAL TERMS

## 9.0    GUARANTEES

**9.1**    Services supplied by Contractor under this Contract, shall be performed by Vulcan Energy Solutions LLC or its subcontractors only.

**9.2**    Contractor agrees to perform the Services in accordance with the highest professional standards.    Contractor is hereby given notice that MOE will be relying on the accuracy, competence and completeness of Contractor's Services hereunder.

| VULCAN ENERGY SOLUTIONS, LLC | TECHNICAL SERVICES AGREEMENT |
|---|---|
| MINISTRY OF ELECTRICTY - TASK ORDER | February 21, 2005 |
| IRAQ POWER REHABILITATION | Contract: VES-050127-01B-FINAL1 |

**9.3**    Contractor agrees to and welcomes the MOE and its representatives to inspect work and project sites at all times, with reasonable notice.  This notice is to insure proper security protocol for project sites and MOE personnel.

## 10.0    PERMITS AND LICENSES

Contractor shall keep current all governmental permits (other than Building Permits), certificates and licenses (including professional licenses) necessary for Contractor to perform the Services.

## 11.0    SUSPENSION OF SERVICES

MOE may by written notice to Contractor suspend further performance of the Services and later may by written notice to Contractor withdraw all or part of the suspension.

For events beyond the control of the Contractor (safety, logistics etc.)  Contractor may by written notice to the MOE suspend further performance of Services and later may by written notice to the MOE withdraw all or part of the suspension.

Any proposed changes to the scheduled time of completion of the Services resulting from said suspension must be submitted by Contractor to MOE in accordance with the provisions of Article 12.0, entitled Changes.

In the event of Suspension of Services of 48hrs or less, Contractor shall bill MOE for all routine project expenses less hourly wages of craft personnel.

In the event the Suspension of Services last in excess of 48hrs, Contractor shall bill MOE for all routine project expenses and eight (8) hours per day for all craft personnel, including any travel or security expenses to mobilize or demobilize Contractor personnel.

Any Suspension of Services shall directly affect the outcome of the project schedule and may impact project for a longer period of time than was actual time of Suspension of Services.

## 12.0    TERMINATION

**12.1**    MOE shall have the unrestricted right to terminate for convenience, further performance of all or any part of the Services by written notice.  In such case, Contractor shall immediately discontinue performance of the Services on the date specified in such notice, and shall preserve work in progress pending disposition instructions by MOE.

**12.2**    If terminated, the Contractor shall recover from MOE as full payment for such terminated Services, the actual costs of all Services satisfactorily executed to

| VULCAN ENERGY SOLUTIONS, LLC | TECHNICAL SERVICES AGREEMENT |
|---|---|
| MINISTRY OF ELECTRICTY - TASK ORDER | February 21, 2005 |
| IRAQ POWER REHABILITATION | Contract: VES-050127-01B-FINAL1 |

the date of termination as per Contractor's rate schedule, reasonable demobilization costs, and reasonable profit.

**12.3** In the event that Contractor shall default in the performance of any obligation to be performed by Contractor under this Contract, and shall fail to correct such default within five (5) working days or additional time agreed to by the MOE and the Contractor. In the event Contractor and MOE cannot agree on a solution, the MOE may at this point terminate this contract with written notice to contractor.

Following written notice thereof from MOE specifying the date of termination, Contractor will bill MOE for all demobilization cost and outstanding invoices, and MOE agrees to pay such cost in an expedited manner not to exceed payment terms in this contract. In the event of such termination, MOE may take over and finish the Services by whatever method MOE may deem expedient.

## 13.0  INVOICING AND PAYMENTS

**13.1** All invoices shall be sent to MOE's mailing address (above) and marked to the attention of Republic of Iraq Minister of Electricity. All invoices shall be marked with MOE contract number.

**13.2** Contractor shall invoice for that portion of the Services performed during the ½ month and not previously invoiced. Submission of the invoice shall be per Section 11.7. MOE shall within five (5) business days issue a letter to Bank holding Letter of Credit, authorizing the release of funds in amount of invoice.

**13.3** Payment by the MOE to the Contractor shall occur by bank wire to the Contractor's bank account. These instructions have described in Section 8.2

**13.4** At signing of this contract, The MOE shall provide an irrevocable Letter of Credit issued at JP Morgan Bank in New York City, New York to the Contractor or a USD cash deposit of not less than $12,200,000.00 USD.

**13.5** Contractor shall submit invoices in a manner that details all invoiced items. Labor and Life Support shall be invoiced separate from Parts and Materials. The invoices will be paid as follows:

> A. Parts and Materials shall be invoiced at 80% of cost with supporting shipping documentation. An additional 10% may be invoiced upon delivery of said Parts and Materials to project site. The remaining 10% will be paid in two separate 5% payments. The first 5% shall be paid upon signed successful completion by MOE. The remaining 5% will be held by MOE until Contractors' one (1) year guarantee has expired. This final 5% will be released by MOE within 15 days of expiration of guarantee.

      B.  Labor and Life Support shall be invoiced at 90% of cost with supporting documentation. The remaining 10% will be paid in two separate 5% payments. The first 5% shall be paid upon signed successful completion by MOE. The remaining 5% will be held by MOE until Contractors' one (1) year guarantee has expired. This final 5% will be released by MOE within 15 days of expiration of guarantee.

**13.6**    Subject to the terms of this Contract and upon MOE's written request, Contractor shall furnish evidence reasonably satisfactory to MOE, that all labor furnished and materials consumed by Contractor during the invoice period has been paid in full, and that the Services are not subject to liens or claims on account thereof.  MOE may withhold payment of the invoice until Contractor furnishes such evidence.  Contractor will defend, indemnify and hold MOE harmless from and against all claims, loss or expense arising from or relating to liens or claims by Contractor's suppliers and/or subcontractors.

**13.7**    The cut-off date for Contractor's invoice shall be the last working day nearest the end of each month.

**13.8**    Invoices shall be collected and submitted promptly by the Contractor.

## 14.0  CHANGES

**14.1**    Contractor shall give MOE written notice within five (5) working days after any event which may give rise to a claim by Contractor for a change in the General Scope of Work as set forth in Section 2.0 above.

**14.2**    Within five (5) working days after such event, Contractor shall supply MOE with a written statement supporting Contractor's claim, which statement shall include Contractor's detailed estimate of the change in the scheduled time of performance of the Services occasioned thereby.  MOE shall not be bound to any such adjustments in this Contract unless expressly agreed to by MOE in writing.

## 15.0  INSURANCE

Contractor shall maintain the insurance coverage set forth below:

**15.1**    Workers' Compensation in accordance with the provisions of the applicable Workers' Compensation laws or similar laws of the state, territory, province, or political subdivision having jurisdiction over the employee, and Employer's Liability coverage with a minimum limit of liability of $500,000 for each occurrence.

**15.2**    Commercial General Liability coverage, including completed operations coverage and contractual liability coverage, with a minimum combined single

limit of liability of $1,000,000 per occurrence for bodily injury and property damage.

15.3    Certificates of insurance satisfactory in form to MOE evidencing that all of the insurance required pursuant to this Article is in force, and that not less than thirty (30) days written notice will be given to MOE prior to any cancellation or restrictive modification of the policies, shall be furnished to MOE prior to the commencement of the Services.

## 16. PROPRIETARY RIGHTS

16.1    All materials that Contractor develops rendering Services hereunder, including any inventions or copyrightable work products, shall become the sole and exclusive property of MOE without limitation and such materials shall, together with any materials furnished to Contractor by MOE hereunder, be delivered to MOE at the termination, completion or suspension of the Services.

16.2    Contractor agrees to execute all documents and to take all steps that MOE deems necessary or desirable to protect MOE's ownership and property rights of these materials.

## 17.0    SUBCONTRACTS AND ASSIGNMENTS

This Contract is personal to Contractor and Contractor shall be allowed to subcontract or assign the performance of any portion of these Services without the prior written consent of MOE.  Contractor hereby agrees that MOE may assign this Contract to (i) Owner, (ii) Owner's designated representative, or to (iii) MOE's affiliates.

## 18.0    CONFIDENTIAL INFORMATION

18.1    Contractor agrees not to divulge to any third party nor to use for any purpose other than Contractor's performance hereunder, any business or technical information of or relating to MOE that is disclosed or acquired by Contractor during the term of this Contract, except:

    18.1.1 Information which is or properly becomes part of the public domain; or

    18.1.2 Information, which is in Contractor's possession at the time of disclosure to or acquisition by Contractor, provided Contractor has the right of free and unlimited disclosure thereof.

18.2    The above obligations shall remain in effect for a period of five (5) years from the date of disclosure of the information, notwithstanding any prior completion, termination or suspension of the Services.

| VULCAN ENERGY SOLUTIONS, LLC | TECHNICAL SERVICES AGREEMENT |
|---|---|
| MINISTRY OF ELECTRICTY - TASK ORDER | February 21, 2005 |
| IRAQ POWER REHABILITATION | Contract: VES-050127-01B-FINAL1 |

## 19.0   INDEPENDENT CONTRACTOR

**19.1**   Contractor shall act as an independent contractor having responsibility for and control over the means and details of performing the Services, and not as an employee or agent of MOE.

## 20.0   EMPLOYMENT PRACTICES

**20.1**   Contractor certifies that it has an affirmative action policy ensuring equal employment opportunity without regard to race, color, national origin, sex, age, religion or handicap, that it maintains no employee facilities segregated on the basis of race, color, religion or national origin, and that it is not debarred or suspended from being awarded Federal or Federally assisted contracts.

## 21.0   LAWS AND REGULATIONS

Contractor shall comply with all United States of America industry codes and regulations applicable to Contractor's Services in the performance of this Contract.

## 22.0   INSPECTION AND ACCESS

MOE shall at all times have access to the Contractor's Services product developed under this Contract wherever in preparation, and Contractor shall facilitate such access and inspection thereof. Inspection or lack of inspection by MOE shall not be deemed to be a waiver of any of its rights under Contractor's guarantees or of its right to subsequently reject defective services.

## 23.0   APPLICABLE LAW

Any disputes arising out of this Contract shall be construed and interpreted according to the United States Law in the State of New York as applicable, excluding provisions thereof, which would refer to the laws of another body of law.  In the event of a dispute, each party agrees to binding arbitration under the rules of the American Arbitration Association in New York, New York.

## 24.0   SURVIVAL

The provisions of this Contract, which by their nature are intended to survive the termination, cancellation, completion or expiration of this Contract shall continue as valid and enforceable obligations of the parties notwithstanding any such termination, cancellation, completion or expiration.

## 25.0   WAIVER OF LIENS

To the full extent provided by applicable law, Contractor waives its right to file any liens once it has been fully paid for its services, work, costs, expenses or fees on any property in connection with the Services. This waiver is unconditional and irrevocable.

## 24.0   ATTACHMENTS, EXHIBITS AND OTHER DOCUMENTS.

The following attachments, exhibits and other documents by this reference are made a part hereof:

## 25.0   LIQUIDATED DAMAGES:

Vulcan agrees to a Liquidated Damage Fee of $50,000.00 USD per MW for each Unit that does not meet the guarantee of 20MW at ISO as stated in Section-2, Sub-Section-14.

## 26.0   EXHIBITS:

| | |
|---|---|
| Exhibit A: | Schedule of Payment |
| Exhibit B: | Gas Filtration Unit |

**IN WITNESS WHEREOF,** the parties hereto have executed this Contract on the day and year below written, but effective as of the day and year first set forth above.

**Vulcan Energy Solutions, LLC**          **Ministry of Electricity – Iraq Government**

**By**                                   **By**
Robert P. Virgo

**Title**                                **Title**
Vice President of Projects

**Date**                                 **Date**
February 21, 2005

Signature                                Signature

Page 15 of 17

| VULCAN ENERGY SOLUTIONS, LLC | TECHNICAL SERVICES AGREEMENT |
|---|---|
| MINISTRY OF ELECTRICTY - TASK ORDER | February 21, 2005 |
| IRAQ POWER REHABILITATION | Contract VES-050127-01B-FINAL1 |

25.0   WAIVER OF LIENS

To the full extent provided by applicable law, Contractor waives its right to file any liens once it has been fully paid for its services, work, costs, expenses or fees on any property in connection with the Services  This waiver is unconditional and irrevocable

24.0   ATTACHMENTS, EXHIBITS AND OTHER DOCUMENTS.

The following attachments, exhibits and other documents by this reference are made a part hereof:

25.0   LIQUIDATED DAMAGES:

Vulcan agrees to a Liquidated Damage Fee of $50,000 00 USD per MW for each Un t that does not meet the guarantee of 20MW at ISO as stated in Section-2, Sub-Section-14.

26.0   EXHIBITS:

Exhibit A.        Schedule of Payment
Exhibit B        Gas Filtration Unit

IN WITNESS WHEREOF, the parties hereto have executed this Contract on the day and year below written, but effective as of the day and year first set forth above

**Vulcan Energy Solutions, LLC**              **Ministry of Electricity – Iraq Government**

By        Robert P. Virgo                         By        _AIHAM ALSAMMARAE_

Title        Vice President of Projects          Title        _Minister el Electricity_

Date        February 21, 2005                     Date        _Feb. 22, 2005_

_Robert P. Virgo_                                  _Aiham Alsammarae_
Signature                                          Signature

Page 15 of 17

السيد الوزير المحترم

تحية وتقديراً

م/عقد شركة فولكان

توجهـــاتكم لمناقشـــة ممـــثلي شـــركة فولكســـان حـــول العـــرض الوحـــيد لتأهـــيل (١٢) وحـــدة غازيـــة في محطـــة مـــلا عـــبد الله نـــود أن نبين ما يأتي:

١. وافقـت الشـــركة عـــلى إضـــافة الفقـــرتين (١ ، ٢) مـــن مطالعتـــنا العـــدد ١٧١ في ٢٠٠٥/٢/١٧ مقـــابل زيـــادة في المـــبلغ ليصـــبح المـــبلغ الكلـــي حوالـــي (٧٤) ملـــيون دولار ولـــيس حســـب تخمـــين الشـــركة خـــلال المناقشـــات والـــتي كانـــت حوالـــي (٦٤) ملـــيون دولار حيـــث بينـــت الشركة بان الفرق هو بسبب كلف الشحن.

٢. لم توافـــق الشـــركة ان يخضـــع العقـــد إلى الشـــروط العامـــة لـــلمقاولات العراقية والقانون العراقي.

٣. نعـــتقد بـــأن الســـعر عـــالي والمـــبلغ التخمـــيني الأول والـــذي هـــو حوالـــي (٦٤) مليون دولار مناسب مقارنة بالعروض المماثلة.

٤. ضـــرورة إدخـــال وحـــدة تحلـــية الغـــاز ضـــمن العقـــد لـــلمحافظة عـــلى ســـلامة تشـــغيل الوحـــدات الغازيـــة وبمـــبلغ اجمـــالي يقـــدر بـــ (٢١) مليون دولار.

للتفضل بالاطلاع والتنسيب . . . . مع وافر التقدير والاحترام

يحيى داود يحيى          مصطفى كاظم أحمد          أنس حبيب طوبيا          عبد علي المعماري

خبير          و. مدير عام          مدير عام          المستشار القانوني

**VULCAN ENERGY SOLUTIONS, LLC**
**MINISTRY OF ELECTRICTY - TASK ORDER**
**IRAQ POWER REHABILITATION**

TECHNICAL SERVICES AGREEMENT
February 21, 2005
Contract: VES-050127-01B-FINAL1

## Exhibit - A

### Schedule of Payments

| Payments | Date | Amount |
|---|---|---|
| Mobilization Fee | At Placement of LC | $12,200,000.00USD |
| Invoice 1 | 30 Days from Mobilization | To be determined from hours, parts, supplies, services |
| Invoice 2 | 30 Days from Invoice 1 | To be determined from hours, parts, supplies, services |
| Invoice 3 | 30 Days from Invoice 2 | To be determined from hours, parts, supplies, services |
| Invoice 4 | 30 Days from Invoice 3 | To be determined from hours, parts, supplies, services |
| Invoice 5 | 30 Days from Invoice 4 | To be determined from hours, parts, supplies, services |
| Invoice 6 | 30 Days from Invoice 5 | To be determined from hours, parts, supplies, services |
| Invoice 7 | 30 Days from Invoice 6 | To be determined from hours, parts, supplies, services |
| Invoice 8 | 30 Days from Invoice 7 | To be determined from hours, parts, supplies, services |
| Invoice 9 | 30 Days from Invoice 8 | To be determined from hours, parts, supplies, services |
| Invoice 10 | 30 Days from Invoice 9 | To be determined from hours, parts, supplies, services |
| Invoice 11 | 30 Days from Invoice 11 | To be determined from hours, parts, supplies, services |
| Invoice 12 | Final Invoice Submitted at Project Completion | To be determined from hours, parts, supplies, services |

| VULCAN ENERGY SOLUTIONS, LLC | TECHNICAL SERVICES AGREEMENT |
|---|---|
| MINISTRY OF ELECTRICTY - TASK ORDER | February 21, 2005 |
| IRAQ POWER REHABILITATION | Contract: VES-050127-01B-FINAL1 |

## Exhibit-B

### Gas Filtration Unit for Mulla Abdulla Old and Mulla Abdulla New Plants

This Gas Filtration Unit will serve 12 GE Frame-5 Combustion Units located at Mulla Abdulla Old, and 4 GE Frame-6B Combustion Units located at Mulla Abdulla New.

Price and Specifications for Gas Filtration Unit will be provided at a later date, and is NOT included in this contract price. The Gas Filtration Unit will be an additional cost to include labor, equipment, and shipping.

EXHIBIT B

THE INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
OF THE AMERICAN ARBITRATION ASSOCIATION

———————————————————— x

**VULCAN ENERGY SOLUTIONS LLC,**  x

    **Claimant**                    x

       -  **against –**            x

**MINISTRY OF ELECTRICITY OF THE**  x    **No. 50 198 T 00441 05**
**REPUBLIC OF IRAQ**
                            x

    **Respondent**

———————————————————— x

## <u>FINAL AWARD OF THE SOLE ARBITRATOR</u>

    **I, THE UNDERSIGNED ARBITRATOR, having been designated**

**in accordance with the arbitration agreement entered into**

**between the above-named parties and dated February 22, 2005,**

and having been duly sworn, and having duly heard the proofs

and allegations of the parties, do hereby, AWARD, as follows:

*Procedure*

1.  The undersigned was invited by the International Centre

for Dispute Resolution on January 20, 2006 to serve as Sole

Arbitrator in the above-titled arbitral proceeding.  He accepted

appointment, disclosing contacts with counsel for the

Respondent in prior cases, and counsel for the parties were so

informed on January 23, 2006.  No objections to his appointment

were raised.

2.  Claimant is principally represented by William Lewis

Sessions, Esq., currently of the firm of Sessions Lambert Selwyn

LLP.   Respondent is principally represented by Jonathan I.

Blackman, Esq., of the firm of Cleary Gottlieb Steen & Hamilton

LLP.

3.  A Preliminary Hearing Conference Call with counsel took

place on February 23, 2006.  Pursuant to it, the parties agreed

upon a scheduling order on March 9, 2006, providing for

the exchange of requests for production of documents, a deadline for production and exchange of lists of the names of persons with possible knowledge relevant to the arbitration, a deadline for submission of Vulcan's Opening Brief and Witness Statements with Exhibits, a deadline for submission of the Response of the Ministry of Electricity and Witness Statements with Exhibits, a deadline for submission of Vulcan's Reply with Reply Witness Statements and Exhibits, and a deadline for submission of the Ministry's Sur-Reply with Sur-Reply Witness Statements and Exhibits.   All prescribed pleadings were duly filed.  Hearings on the merits took place in New York City February 5-8, 2007, and were closed on February 8.  Witnesses, including two who took part from the Middle East by video link, testified and were examined at the hearings.  Post-Hearing Briefs were submitted by the parties on March 5, 2007 and Post-Hearing Reply Briefs were exchanged on March 19, 2007.

*The Contract*

4.   A Power Rehabilitation Contract ("the contract") was concluded on February 22, 2005 between the Ministry of

3

Electricity for Iraq (the "MOE"or "Ministry") and Vulcan Energy

Solutions ("Vulcan" or "Contractor") of Elizabethtown, North

Carolina, for the refurbishment of turbine and compressor rotors

and related work at the Mulla Abdulla Site in Iraq.  Vulcan had

previously worked as a subcontractor in Iraq; the Power

Rehabilitation Contract was its first prime contract.  Services

were to commence on or about March 15, 2005 and to be

completed not later than 210 days from commencement.  Total

compensation was not to exceed USD $64,000,000.  Article 8.1

of the contract, under the heading "Compensation", specifies:

"The schedule for payment under this provision is provided in
Exhibit A.  The Contractor will provide services to fulfill the
contract requirements and will be paid to provide the services
provided in Exhibit B...

"At the signing of this Contract, the MOE shall deliver an
irrevocable Letter of Credit issued at JP Morgan of New York in
the amount of $12,200,000.00 USD to Contractor as a
mobilization fee for labor and required parts.  Vulcan will deliver
invoices along with appropriate documentation to the MOE for
payment every 30 days..."

Under the heading, "Invoicing and Payments," Section 13.2

provides:

"Contractor shall invoice for that portion of the Services
performed during the ½ month and not previously invoiced....MOE

4

shall within five (5) business days issue a letter to Bank holding Letter of Credit, authorizing the release of funds in amount of invoice."

Section 13.4 specifies:

"At signing of this contract, The MOE shall provide an irrevocable Letter of Credit issued at JP Morgan Bank in New York City, New York to the Contractor or a USD cash deposit of not less than $12,200,000.00 USD."

Section 13.5 provides:

"Contractor shall submit invoices in a manner that details all invoiced items..."

Section 13.6 provides:

"Subject to the terms of this Contract and upon MOE's written request, Contractor shall furnish evidence reasonably satisfactory to MOE, that all labor furnished and materials consumed by Contractor during the invoice period has been paid in full..."

Under the heading, "Applicable Law", Section 23 provides:

"Any disputes arising out of this Contract shall be construed and interpreted according to the United States Law in the State of New York as applicable, excluding provisions thereof, which would refer to the laws of another body of law.  In the event of a dispute, each party agrees to binding arbitration under the rules of the American Arbitration Association in New York, New York."

Exhibit A, "Schedule of Payments", is a table of payments by date and amount.  The first lines read:

| "Payments | Date | Amount |
| --- | --- | --- |

5

"Mobilization Fee   At Placement of LC          $12,200,000.00USD

Invoice 1          30 Days from Mobilization  To be determined..."

5.  The contract was signed in Baghdad on February 21,

2006 by Robert P. Virgo, Vulcan's Vice President for Projects,

and, on February 22, 2006, by Dr. Aiham Alsammarae, Minister of

Electricity.  It was accompanied, apparently as a part of or an

appendix to the contract, by a letter in Arabic, with four

signatures, untranslated into English.

6.  The terms of the contract, particularly its technical

terms as to the generating units to be rehabilitated and the price

of the specifics of the work, were negotiated by Mr. Virgo and Mr.

J.C. Adams of Vulcan with representatives of the Ministry of

Electricity, led by a senior engineer who had decades of Ministry

experience, Mr. Aiser Habib.  His technical department of the

Ministry signed off on the contract.  Whether the legal and

commercial departments of the Ministry, whose representatives

were present, signed the contract is in dispute between counsel.

Practice required their stamps on the contract before its

presentation to the Minister and counsel for the Ministry maintain

that those stamps do not appear.  The contract was presented to Minister Alsammarae for signature.  It has not been shown whether, before signature, Minister Alsammarae read the letter in Arabic signed by four of his senior subordinates.   The translation provided to the Sole Arbitrator refers to the Minister's "instructions on entering into discussions" regarding "the sole offer" in respect of Mulla Abdullah, and essentially noted that there was a difference between the Ministry and the Contractor on the appropriate price; and that the Contractor did not agree to subjecting the contract to Iraqi law.  Vulcan interprets the letter as approval of the contract by the Ministry's senior officials, whereas Mr. Aiser Habib in his oral testimony interpreted it as a conditional approval, meant to signal to the Minister that he and his senior associates had reservations.

7.   Minister Alsammarae, prior to his appointment as Minister of Electricity in the interim Government of Iraq of which Dr. Ayad Allawi was Prime Minister, had lived in Chicago and engaged for three decades in business there with an electrical contracting firm, KCI Engineering Consultants "(KCI").  The initial

7

meeting between representatives of Vulcan and Minister

Alsammarae took place on December 27, 2004, in Chicago, in the

premises of KCI, of which Dr. Alsammarae is or was executive

director. No other official representatives of the Government of

Iraq were present. It is common ground between the parties

that, at that meeting, Minister Alsammarae assured the

representatives of Vulcan that Vulcan would be given contracts

for rehabilitation of generators in Iraq. But it is a matter of acute

controversy what else transpired.

*Allegations of bribery*

8. In his initial Witness Statement of July 24, 2006, Mr.

Adams recounts that he had worked on Vulcan's subcontracts in

Iraq but was owed some $150,000 in unpaid salary. He states

that he was induced to join in meeting with Dr. Alsammarae in

Chicago by the assurance that, if Vulcan were to win one or more

prime contracts, his unpaid wages would be paid. Mr. Adams

reports that the Vulcan representatives discussed with Dr.

Alsammarae in Chicago the projects that he had in mind and that

he then left Vulcan's president, Mr. Ford Graham, together with

two employees of KCI, one of whom was Dr. Badar Hussain.    Mr.

Adams continues:

"As we were walking to the car, Mr. Graham told the group that he had agreed to pay a 10% 'engineering fee' as a bribe for obtaining any contract with the MOE." (At p. 5.)

Mr. Adams adds that subsequently:

"...I learned that there would be no immediate down payment as we expected, but we would need to wait for payment through a letter of credit setup at JPMorgan Chase." (P. 7.)

Mr. Adams further asserts that, when an invoice was required to

release funds covered by the letter of credit,

 "The invoice listed a total of $12.2 million for 'work completed during this period' when in fact Vulcan had not spent any money on mobilization...Finally the invoice included $3 million for 'engineering costs' which represented the kick-back paid to KCI." (P. 8.)

Mr. Adams added that when he returned to Baghdad he was told

by an MOE official that:

"...everyone at the MOE knew how Vulcan was awarded the Mulla Abdulla contract.  He told me that Dr. Alsammarae had failed to follow the established procedures for the approval of the contract...the MOE nonetheless still wanted to see the work performed at Mulla Abdulla, and they would be willing to go forward with the contract and make the advance payment to Vulcan, so long as we either began mobilization or provided a bank guarantee to insure return of the advance payment amount if Vulcan failed to perform...However, the reality was that Vulcan had no financial resources to do any of these things.  Although

9

individuals at Vulcan, including myself, had the technical skill necessary to oversee the Mulla Abdulla contract, Vulcan had no money to mobilize men or equipment. Without an immediate up-front mobilization payment, Vulcan was simply unable to begin performance of the contract." (At p. 9.)

Mr. Adams concluded his affidavit by noting that he was in litigation with Vulcan to recover unpaid wages and expenses.

9.   Affidavits filed by others present at the Chicago meeting flatly and fully deny the account of Mr. Adams and assert that no bribe was ever offered or accepted. The written pleadings of Vulcan state that nothing was said at the meeting in Chicago, directly or indirectly, about any bribe or kickback. The engineering fee is described as a legitimate expense of making the engineering adjustments necessary in the construction process and of ensuring that the plant will function properly. The allowance of substantial engineering fees, Vulcan maintains, is evidence of prudent risk management, not a slush fund for bribery. At the oral hearing, witnesses for Vulcan steadfastly denied any bribe.

10.   At the same time, counsel for the Ministry pointed to references to an "engineering fee" in e-mail traffic and spread

sheets.  Thus an e-mail message from Ford Graham to J.C.

Adams and others of February 17, 2005 states that:

"At some point we need to confirm with the Dr. that he and Badar
[a KCI official with whom Mr. Ford had met in Chicago] are on the
same page regarding the engineering contracts we have agreed
to."

When matters were blocked over the issue of release of the

mobilization fee, a message to Mr. Graham of May 31, 2005 from

Mr. Hydar Shamkani, an agent in Iraq of Vulcan, remarked that

"...Mr. Engineering is still in Amman...Ford, please give the
engineering fee some thought.  This could make the difference in
the deal."

There was considerable e-mail traffic between Mr. Ford and Dr.

Alsammarae about expediting issuance of the letter of credit

and, once the letter of credit was issued, about authorizing the

release of the funds that it covered.  In seeking Dr. Alsammarae's

assistance after he had left office, Mr. Graham, in an e-mail

message of October 17, 2005, wrote to him:

"I ask you to intervene and directly force this issue to be paid.
Without your influence, we will not get paid and cannot bring our
people into the country, nor pay for parts, equipments, service, or
even for the engineering services we will require."

11

11.  In a subsequent affidavit of August 22, 2006, Mr. Adams

reiterated his allegations about "the total bribe that Vulcan

agreed to pay Dr. Alsammarae for the Contract..." (p. 8).    He

repeated the substance of his bribery allegations in a Sworn

Third Statement of December 1, 2006.

12.  Vulcan brought suit against Mr. Adams in the United

States District Court, Northern District of Florida, seeking to bar

him from violating non-disclosure provisions of his written

agreements with Vulcan.  In a settlement of that suit dated

January 11, 2007, Mr. Adams accepts that he

"has realized that representatives of the firm of Cleary Gottlieb
Steen & Hamilton, LLP...counsel for the Ministry...mislead [sic]
Adams with respect to his statements made in the
arbitration...Adams has realized that Cleary lawyers unfairly
constructed Adams' statements in a manner that inaccurately
portrays Adams' knowledge..."

The settlement agreement provides that

"Vulcan will pay Adams $140,000 in full settlement of any and all
claims...Adams may have against Vulcan...Adams will clarify and
correct all information contained in  his statements filed in
the...Arbitration and admit where he was speculating in those
statements...Adams will acknowledge and confirm Vulcan's
efforts and actions to mobilize in Iraq...withdraw his statements
made in the...Arbitration because of Cleary's misrepresentations
and wrongful conduct of Cleary with respect to obtaining the
statements from him...."

12

13.  Counsel of Cleary Gottlieb filed statements with the Sole Arbitrator (of Andrew Weaver, Esq. and Daniel Zipp, Esq. dated January 23, 2007) in which they set out in detail how they came to have knowledge of Mr. Adams' revelations, affirmed that Mr. Adams' attestations were freely volunteered by him, maintain that drafts of his testimony were reviewed and amended by him, and attest that that testimony was in no way misrepresented by them.  Cleary Gottlieb contended that Mr. Adams was being paid to repudiate much of his earlier sworn submissions and to request their withdrawal.  Counsel for Vulcan countered that he was paid in settlement of his claims for non-payment of wages and expenses, and submitted that his affidavits should be withdrawn pursuant to his request.  The Sole Arbitrator ruled that the Adams' affidavits would remain in evidence and would be given such weight as they appeared to merit.

14.  Allegations of bribery and the credibility of statements of affiants and witnesses in respect of those allegations will be dealt with below.

*The Authority of Minister Alsammerae to Contract*

13

15.   Dr. Alsammerae signed the contract shortly before leaving office in the interim Government of which Mr. Allawi was Prime Minister.  Prime Minister Allawi had directed the heads of all Iraqi Ministries on January 29, 2005 "not to adopt any decisions that would be binding on the transitional government, especially in the area of financial obligations..." Counsel for the Ministry accordingly maintain that Minister Alsammarae lacked authority to conclude the contract at issue.  Moreover, they maintain that, under the law of Iraq, the Ministry should have advertised for bids or invited a minimum of three companies to submit proposals, whereas in the instant case Minister Alsammarae directed his staff to conclude the contract solely with Vulcan.  Counsel for the Ministry observe that the evidence shows that the contract for Mulla  Abdulla was awarded to Vulcan without inviting other bids and without following the normal procedures of the Ministry.  Public Order 87 of the Provisional Coalition  Authority provided that, "to the maximum extent practicable, government contracts" were to be awarded "on a competitive basis".  Standard Iraqi regulations were

14

consistent with these provisions.  Nor was the price of the

negotiated contract with Vulcan made public as required.

Moreover, it is undisputed that the Ministry made known its

intention to award Vulcan a no-bid contract before even

receiving from Vulcan a proposal covering the work to be done at

Mulla Abdulla.

16.   Counsel for Vulcan counter that the Iraqi procedures

invoked by the Ministry had been displaced by the Coalition

Provisional Authority's Public Order 87, which authorized

negotiated contracts "whenever the interests of the

governmental unit or agency concerned will best be served by

awarding the contract on a basis other than the lowest price."

That Order remained in effect when the contract was concluded.

As to the authority of Minister Alsammarae to contract, Vulcan

maintains that the Allawi directive was no more than a guideline

which in any event permitted ministers to make exceptions in

emergency situations, provided that the minister consulted the

Prime Minister.  The Ministry has provided no evidence that

Minister Alsammarae did not consult the Prime Minister.  Minister

15

Alsammarae had apparent authority to enter into the contract;

Vulcan relied on that authority; and the Ministry thereafter

treated the contract as one that was valid and in force.  Not only

did it fail to repudiate the contract; it partially performed by

providing a letter of credit of which Vulcan was to be the

beneficiary.  The Ministry did not assert that Dr. Alsammarae

lacked the authority to bind the Ministry until it filed its

Statement of Defence in the arbitration, more than eight months

after the signature of the contract.

17.  The issue of the authority of Dr. Alsammarae to enter

into the contract will be passed upon below.

*The Mobilization Fee*

18.  The issue most searchingly contested by counsel was

that of the payment – or non-payment – of the mobilization fee.

The dispute between the parties turned above all on that

question.

19.  The Ministry opened a letter of credit in favor of Vulcan

not at, but some weeks after, the signing of the contract.

However, JP Morgan was not authorized to make payment under

16

the letter of credit in the absence of mobilization on the ground

at Mulla Abdulla, or until an invoice was transmitted by Vulcan in

support of the expenses of that mobilization, or, in the

alternative, the provision by Vulcan of a bank guarantee for the

amount of the drawdown under the letter of credit.

20.   Vulcan argues that the governing provisions of the

contract are clear and compelling.  They are set out above in

paragraph 4 of this Award.  Para. 8.1, on "Compensation, Value"

provides that,

"At the signing of this Contract, the MOE shall deliver an
Irrevocable Letter of Credit Issued at JP Morgan of New York in
the amount of $12,200,000.00USD to Contractor as a mobilization
fee for labor and required parts.  Vulcan will deliver invoices with
appropriate documentation to the MOE for payment every 30
days."

The specification, "At the signing of this Contract", Vulcan

 argues, is unambiguous;  "at" means then, not later; and

that the Ministry "shall" deliver an irrevocable Letter of Credit is

a mandatory obligation.  The references to invoices refers to

invoices for subsequent payments for subsequent work.

Moreover, under the heading "Invoicing and Payments," Article

13.4 confirms that:

**17**

"At the signing of this contract, The MOE shall provide an irrevocable Letter of Credit issued at JP Morgan Bank in New York City, New York to the Contractor or a USD cash deposit of no less than $12,200,000.00USD."

Vulcan finds this prescription to be equally clear and categoric.

It argues that this interpretation is sustained by the format of

Exhibit A, the Schedule of Payments, reproduced in paragraph 4

above.  The essence of Vulcan's argument is that the Ministry

stands in breach of the contract because it failed to open the

letter of credit at the signing of the contract; because, once the

letter of credit was belatedly opened, the MOE conditioned

drawing on it upon either the commencement of Vulcan's

mobilization on the ground at Mulla Abdulla or the rendering of an

invoice for the expenses of so doing or upon Vulcan's provision of

a bank guarantee.  Vulcan maintains that these conditions were

extra-contractual and that, in attempting to fulfill them, it

reserved its rights, making clear its position that the Ministry

was unconditionally bound to open a letter of credit on the

signing of the contract on the basis of which Vulcan could

immediately draw down $12,200,000.  In the event, Vulcan did

furnish an invoice purporting to show that it incurred expenses in

18

mobilizing totalling $12,200,200, because, it says, it was given to understand that the $12,200,000 would be released once it did so. It also transmitted a guaranty from its insurance broker which it maintained fulfilled the request for a bank guaranty. Vulcan did not dispute that, in the absence of payment of the mobilization fee to it, it was not in a financial position actually to incur the expenses of mobilization. It argues that a small company such as Vulcan could not have been expected to incur the very large expenses of mobilization, in an area of acute danger, without an "up-front" payment by the MOE; and that it made its position on payment of the mobilization fee at the signing of the contract clear throughout the negotiation of the contract and thereafter.

21. The Ministry for its part maintains that the proper interpretation of the terms of the contract sustains its conditioning drawing on the letter of credit as it did. It points out that a letter of credit is a document used in commerce that requires the issuing bank to make payment on presentation of

19

the requisite documents.   It cites New York law defining a letter

of credit as

"a definite undertaking...by an issuer [the bank issuing the letter
of credit] to a beneficiary at the request or for the account of an
applicant...to honor a documentary presentation by payment or
delivery of an item of value." NY U.C.C. para. 5-102(a)(10).

The MOE's here specifying that mobilization on the ground should

be documented by an invoice attesting to the expenses of

mobilization, or, in the alternative, that a bank guaranty be

provided, was in accord with commercial practice and the

normal meaning accorded to a letter of credit.  The Ministry

observes that Section 8.1 of the contract required Vulcan to

deliver invoices "along with appropriate documentation to the

MOE for payment every 30 days".  Section 13.2 of the contract

further provides that

 "Contractor shall invoice for that portion of the Services
performed during the ½ month and not previously invoiced...MOE
shall within five (5) business days issue a letter to Bank holding
Letter of Credit, authorizing the release of funds in amount of
invoice."

Counsel for the Ministry contend that there is no exception in the

foregoing language for the initial mobilization payment;

mobilization is part of the Services and the Services must be

performed and invoiced for payment to be made.  In point of fact,

the Letter of Credit Advice of April 20, 2005 to Vulcan referring to

the Mulla Abdulla contract stated that

"At the request of the issuing Bank indicated above [JP Morgan
Chase Bank], we are forwarding a letter of credit issued in your
favor.  We are holding the original Letter of Credit at our counters
pending presentation of documents for examination by us...Upon
completion of our review of documents under this credit, and
provided they comply with the terms and conditions, we shall
forward your DOCUMENTS TO JPMORGAN CHASE BANK,
LONDON.  Payment shall be effected only upon receipt of funds
from them.  ALL DOCUMENTS MUST BE PREPARED PER THE
TERMS AND CONDITIONS OF THE LETTER OF
CREDIT...DOCUMENTS UNDER THIS LETTER OF CREDIT SHOULD
BE PRESENTED TO THE FOLLOWING LOCATION...Payment will be
made against Applicant's instructions according to contractors
invoices and acts of executed works in accordance with the
monthly schedule and acceptance of the goods, to be advised to
us by the Trade Bank of Iraq..."

The MOE further argues that Vulcan's contention that the MOE

had in effect agreed to make an unsecured $12.2 million loan to a

small company of less than $2 million in equity was inherently

implausible.  While an earlier draft of the contract provided for an

immediate payment to Vulcan, Mr. Adams (see paragraph 8

above) recognized on the signature of the contract that it no

longer so provided.  In an e-mail message of February 20

addressed to Mr. Graham, Mr. Adams wrote:

"The Bad News. There will be no down payment. The down payment cannot exceed 20% of the total project price and will only be paid after the LC is released by JP Morgan of New York. We will also be able to invoice our first and possibly the second invoice at that time as well."

22.    The Ministry further argues that the fact that Section

13.4 of the contract provides, as an alternative to provision of

the letter of credit, for "a USD cash deposit of not less than

$12,200,000 USD", does not show that Vulcan was entitled to a

cash payment of that sum in advance of mobilization.  The MOE

by virtue of this provision had the choice of making payment by a

letter of credit or by means of a cash deposit.  But the provision

for a cash deposit did not mean that Vulcan was entitled to

immediate payment in cash; it looked to a deposit on which

Vulcan would draw against conforming documentation.  Finally,

the Ministry argues that, insofar as the provisions of the contract

on payment of the mobilization fee are ambiguous, the contract

should be construed *contra proferentem.*  The contract was

drafted by Vulcan and ambiguities should be interpreted against

it.

23.  Finally, the Ministry draws attention to a memorandum of February 22, 2005 sent by Mr. Marc Solochek, a financial officer of Vulcan Power Group, immediately after signature of the contract, that was sent to Mr. Graham, Mr. Virgo, Mr. Adams and others of the Vulcan group.

"I have reviewed the final contract between the Iraqi Ministry of Electricity ("MOE") and Vulcan Energy Solutions ("VES") and have the following thoughts and comments.

...Initial funding under the contract also seems confusing.  The second paragraph of Section 8.1 provides, 'The schedule for payments under this provision is provided in Exhibit A.' Exhibit A is a three column schedule: ...The first item listed under "Payments" is Mobilization Fee.  That item under 'Date' says "At placement of LC".  And the amount is listed as $12,200,000 (which is the total of the LC).  The third paragraph of Section 8.1 provides, 'At the signing of this Contract, the MOE shall deliver an irrevocable Letter of Credit issued at JP Morgan of New York in the amount of $12,200,000.00 USD to Contractor as a mobilization fee for labor and required parts.'  Given the provision of Exhibit 8, does this mean that VES can draw the entire 12.2 million immediately for mobilization?

If so, then what does Section 13.2 mean?  That section provides, 'Contractor shall invoice for that portion of the Services performed during the ½ month and not previously invoiced...MOE shall within five (5) business days issue a letter to Bank holding Letter of Credit, authorizing the release of funds in amount of invoice.' ...Unless there is an obligation to maintain a $12,200,000 letter of credit at all times during the contract, which would require MOE reimbursing Morgan for each draw

and Morgan restoring the LC upon reimbursement to $12,200,000, an immediate draw of $12,200,000 for mobilization would render the last sentence of Section 13.2...meaningless...

"If, in fact, VES will have the full $12,200,000 mobilization fee immediately available, acquiring the parts and materials to carry out this project should not be difficult. However, if the intent of the contract is to invoice for services, part and materials, even during the mobilization period, these invoicing provisions will make VES' ability to acquire parts and materials very difficult without some working capital at our disposal...Hopefully, we can reserve these needs from the $12,200,000 mobilization fee (assuming we have access to it all up front)..."

24. The issue of the mobilization fee will be likewise ruled upon below.

*Damages*

25. Last, there was dispute between the parties as to whether, if Vulcan's claims of breach of contract were to be sustained, it proved damages. Vulcan maintains that the Ministry violated its clear obligation to pay the $12,200,000 mobilization fee upon execution of the contract and that, because of that breach, it sustained damages for mobilization and contract fulfillment expenses, particularly for provision of security at Mulla Abdulla, as well as for lost profits. Vulcan claims a total of some $22,000,000 (in his Second Sworn Statement, Mr. Graham

24

stated that a true and accurate calculation of damages totalled

$22,225,002 but that sum subsequently was modestly modified at

the oral hearing).  Of that sum, $14,232,000 is for profit that

Vulcan asserts that it would have made had the contract been

implemented.  In the alternative, Vulcan makes a claim for

recovery in quantum meruit.

26. The Ministry contends that Vulcan made virtually no

expenditures in implementation of the contract, that it would

have not made a profit had the contract been implemented, that

Vulcan has not met its burden of proof to establish damages, and

that no damages should be awarded.

27.  In view of the following holdings, the question of

damages does not require further consideration.

### Disposition of the Principal Issues of Liability

A.  <u>The question of bribery</u>

28.   Under the law of the State of New York, "a contract

procured through bribery is not enforceable." *Swig Weiler &*

*Arnow Mgmt. Co. v. Stahl,* 817 F. Supp. 404, 406 (S.D.N.Y. 1993).

In *World Duty Free Co., Ltd. v. Republic of Kenya,* International Centre for Settlement of Investment Disputes, Case No. ARB/00/7, it was stated that "bribery is contrary to the international public policy of most, if not all, States..." Vulcan recognizes that it is "undisputed that a contract procured through bribery may not be enforceable".

29.  The question however is not one of legal principle but one of proof.  It is accepted that bribery will often be difficult to prove, that "corruption will rarely be substantiated by clear evidence" (to quote from *Gulf Resources Corp. v. Republic of Congo,* ICC Case No. 12990 of December 29, 2005).  Nevertheless it must be substantiated.  Otherwise there is danger that claims of bribery in avoidance of contractual obligations will be made, particularly by governmental defendants, when the facts may not sustain such claims.

30.  In the instant case, the essential evidence supporting a finding of corruption is that provided by a former employee of Vulcan who was a principal negotiator of the contract, J. C. Adams.  His recounting of the elements of bribery in his three

witness statements is credible. His withdrawal in large measure

from those statements, and his charges against counsel of

Cleary Gottlieb, are, in the circumstances set out above,

incredible. Moreover, there is some corrobative evidence of the

charge of bribery in e-mail traffic not originating with Mr. Adams,

in the testimony of an employee of a third party, Mr. Brian

Waddell, and in financial tables referring to a fee, but that

evidence is inconclusive. The circumstances of Minister

Alsammerae meeting with Vulcan's representatives in Chicago in

the absence of any other Ministry representatives, his assurance

that Vulcan would be awarded contracts, as well as his

continuing concern with the implementation of the Mulla Abdulla

contract once he had left office, are disquieting. Nor are other

circumstances surrounding Dr. Alsammarae, which are matters

of public record, reassuring. Nevertheless, Mr. Adams'

statements are critical to sustaining the bribery charge. While

those statements remain in evidence, they have been devalued

by Mr. Adams. Mr. Adams cannot be heard at the same time to

27

approbate and reprobate.   In the end, the contract cannot be set aside on the ground that it was procured by bribery.

**B.  The Authority of Minister Assamarae to Contract**

31.  Counsel of the Ministry have raised legitimate questions about the authority of its then Minister Alsammarae to enter into the sole source contract with Vulcan.   His assurances given in Chicago that contracts would be given to Vulcan; his arranging for Vulcan to be the sole source of the Mulla Abdulla commission; his acting to bind the Government of Iraq despite Prime Minister Allawi's apparent injunction; his signing off on a contract that apparently lacked the stamps of the legal and commercial sections of his Ministry, all this gives ground to question Minister Alsammarae's authority to enter into a valid contract with Vulcan.

32.  Nevertheless is it striking that, after Minister Alsammarae's departure from office, and after dispute between the Ministry and Vulcan arose over the payment of the mobilization fee, and despite the prolongation of that dispute, the Ministry neither repudiated nor terminated the contract, on the

ground of Minister Alsammarae's lack of authority or otherwise. On the contrary, as counsel for Vulcan have pointed out, the Ministry performed the contract, in part, by establishing the letter of credit.

33.    In view of the foregoing, it is concluded that the Ministry cannot now be heard to avoid the contract on the ground of the lack of authority of Minister Alsammarae to conclude it.

## C. The Mobilization Fee

34.    In the end, the disposition of this dispute must turn on its paramount issue: payment of the mobilization fee.  The issue is finely balanced.  The terms of the contract are susceptible of an interpretation that goes either way, as was illuminated on the day after of its conclusion by the memorandum of Mr. Solochek, and, more, by the able arguments of counsel on both sides of the question.

35.    It is clear that in contracting it was the intention of Vulcan that the mobilization fee of $12,200,000 be paid to it at the signing of the contract, and in advance of its actually mobilizing men and material at Mulla Abdulla.  That was not only

29

its objective, it was the prerequisite of its performance. But the intention of the Ministry is less clear. It accepted a contract, apparently drafted almost entirely by Vulcan, which did not unconditionally so prescribe, for the reasons set forth in detail above.

36. What is clear is that payment was provided for by means of a letter of credit.  Or, more precisely, Section 13.4 provided that:

"At the signing of this contract, The MOE shall provide an irrevocable Letter of Credit issued at JP Morgan Bank in New York City, New York to the Contractor *or a USD cash deposit of not less than $12,200,000.00USD.*" (Emphasis supplied.)

What was not unconditionally provided was that, at the signing of the contract, the Ministry shall pay $12,200,200 to Vulcan as a mobilization fee.  The alternative provision was for a cash deposit, not for a cash payment, i.e, the MOE was afforded the option either of setting up a letter of credit on which Vulcan could draw, or making a cash deposit on which it could draw.  By the terms of the contract, the option was that of the Ministry. The contract does not provide that, at the option of Vulcan, the Ministry shall provide an irrevocable Letter of Credit or a cash

30

deposit.   If the intention of both parties had been that, on the signing of the contract, the MOE would be obliged immediately and unconditionally to pay Vulcan $12,200,000, there would have been no point in the contract's referring at all to a letter of credit, which characteristically requires payment upon presentation of conforming documents.  Why the contract speaks of a cash deposit is less clear.  But what is clear is that the Ministry was not obliged to make the cash deposit.

37.  There is reason to suppose that the Ministry's insistence on Vulcan's mobilizing on the site of Mulla Abdulla, or providing an invoice for services actually performed, or providing a bank guaranty, as a condition for releasing the funds under the Letter of Credit, was influenced by its perception of the circumstances of the conclusion of the contract, as well perhaps as uncertainty about the ability of Vulcan to perform. But that does not detract from the tenability of the Ministry's legal position.

38. It is accordingly concluded that Vulcan has not established that the Ministry was in breach of the contract by its treatment of payment of the mobilization fee.

**D.  AWARD**

39. The claims of Vulcan Energy Solutions for a finding that the Ministry of Electricity has breached its contract with Vulcan Energy Solutions, and for an award of damages, attorneys' fees and interest, are denied.

40. Each party shall be responsible for the fees of its attorneys.

41. The administrative fees and expenses of the International Centre for Dispute Resolution ("ICDR") totaling NINETEEN THOUSAND FOUR HUNDRED DOLLARS AND ZERO CENTS ($19,400.00) shall be borne as incurred by the parties. The compensation and expenses of the arbitrator totaling ONE HUNDRED TWENTY THOUSAND TWO HUNDRED TWENTY FOUR DOLLARS AND FORTY CENTS ($121,224.40) shall be borne equally by the parties.

32

I hereby certify that, for the purposes of Article 1 of the New

York Convention of 1958 on the Recognition and Enforcement of

Foreign Arbitral Awards, this Final Award was made in New York,

N.Y.

_____          _____
March 28, 2007                           Stephen M. Schwebel


District of Columbia:  ss

I, Stephen M. Schwebel, do hereby affirm upon my oath as
Arbitrator that I am the individual described in and who executed
this instrument, which is my Award.

_____          _____
March 28, 2007                           Stephen M. Schwebel


_____
Notary Public

EVANGELA R. BUTLER-SHERMAN
Notary Public, District of Columbia
Commission Expires Feb. 14, 2011


33

# EXHIBIT C

. ' American Arbitration 5/11/2007 4:09:51 PM   PAGE   2/009   Fax Server

 **International Centre for Dispute Resolution**

Thomas Ventrone
Vice President

1633 Broadway, 10th Floor, New York, NY 10019
Telephone 212-484-4181 Facsimile 212-246-7274
Internet http://www.adr.org/ICDR

May 11, 2007

## VIA FACSIMILE ONLY

William Lewis Sessions, Esq.
Sessions Lambert Selwyn, LLP
1700 Pacific Avenue, Suite 2250
Dallas, TX 75201

Jonathan Blackman, Esq
Cleary Gottlieb Steen & Hamilton
One Liberty Plaza
New York, NY 10006-1470

Re: 50 198 T 00441 05
    Vulcan Energy Solutions, LLC
    vs
    Ministry of Electricity of the Republic of Iraq

Dear Counsel:

This acknowledges receipt of Disposition Of Application For Completion And Clarification Of The Final Award dated May 10, 2007 from the Arbitrator. A copy of has been attached for your reference.

Please contact the undersigned should you have any questions.

Sincerely,

*Tom Simotas*

Tom Simotas
ICDR Supervisor
212 484 4086
SimotasAt@adr.org

cc:   Judge Stephen M. Schwebel (via facsimile)

*A Division of the American Arbitration Association*

, , American Arbitration 5/11/2007 4:09:51 PM    PAGE    3/009    Fax Server

# THE INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
## OF THE AMERICAN ARBITRATION ASSOCIATION

------------------------------------------------ x

**VULCAN ENERGY SOLUTIONS LLC,** x

**Claimant**                          x

    ·   **against** –              x

**MINISTRY OF ELECTRICITY OF THE** x   **No. 50 198 T 00441 05**
**REPUBLIC OF IRAQ**

                               x

**Respondent**

                               x

------------------------------------------------ x

## DISPOSITION OF APPLICATION FOR COMPLETION AND
## CLARIFICATION OF THE FINAL AWARD

American Arbitration 5/11/2007 4:09:51 PM    PAGE    4/009    Fax Server

**I, THE UNDERSIGNED ARBITRATOR, having rendered an**

**Award in the above-titled proceeding dated March 28, 2007,**

**having received from the Claimant a Request for Completion and**

**Clarification of that Award, and having received from the**

**Respondent a Statement in Opposition to that Request,**

**rule as follows.**

    **1. Article 30 of the International Arbitration Rules of the**

**International Centre for Dispute Resolution provides:**

> **"1. Within 30 days after the receipt of an award, any party, with notice to the other parties, may request the tribunal to interpret the award or correct any clerical, typographical or computational errors or to make an additional award as to claims presented but omitted from the award.**

> **"2. If the tribunal considers such a request justified, after considering the contentions of the parties, it shall comply such a request within 30 days after the request."**

    **2. The Sole Arbitrator has given consideration to the**

**Claimant's Request for Completion and Clarification of the**

**Award, as well as to the Respondent's Opposition to Vulcan's**

**Request. The respective contentions of the parties have**

**examined and weighed.**

**2**

American Arbitration 5/11/2007 4:09:51 PM    PAGE    5/009    Fax Server

3.  **The Sole Arbitrator does not consider the Request of the Claimant to be justified.**

4.  **There is no question presented of any clerical error or any error of a typographical or computational nature.**

5.  **The Claimant maintains that certain claims presented by the Claimant were not addressed and dealt with in the Award but, on the contrary, were omitted.  The Claimant also maintains that passages of the Award require interpretation.**

6.  **Article 27 of the ICDR's International Arbitration Rules prescribes that awards "shall be final and binding on the parties" and "shall state the reasons upon which the award is based".  Article 30, quoted above, does not furnish ground for reconsideration of an award.  It does not invite or permit re-argument of issues decided upon in an award.**

7.  **The meaning of the Award of March 28, 2007 is unambiguous.  It does not require interpretation.  The gravamen of the Claimant's case was that the Respondent was unconditionally obligated to make payment of the mobilization fee at the signing of the contract.  The analysis of the Claimant**

3

American Arbitration 5/11/2007 4:09:51 PM    PAGE    6/009    Fax Server

in support of that fundamental contention was set forth in the

Award, together with the rebutting perspective of the

Respondent.   The Sole Arbitrator acknowledged that that issue

was finely balanced.  He set out the considerations that cut in

favor of the contentions of the Claimant and against them.  He

found that, on balance, on this determinative issue, for the

reasons set out in the Award, the Respondent was not, by the

terms of the contract, bound to pay out the mobilization fee

without regard to the Claimant's providing documentation

required by the letter of credit provided for in the contract or

without regard to actual mobilization on the ground.   He found

that a joint intent of the parties to the contrary could not be

established.  The Sole Arbitrator declined to accept the

arguments of the Respondent that bribery rendered the contract

unenforceable and that the Minister of Electricity of the then

Government of Iraq lacked authority to commit the Iraqi

Government. On these issues the Award sustained the position of

the Claimant.  But on the dispositive issue of the time and mode

4

American Arbitration 5/11/2007 4:09:51 PM    PAGE    7/009    Fax Server

of payment of the mobilization fee, and conditions that could be attached to that payment, the Respondent prevailed.

8.   The Claimant acknowledges that its Statement of Claim "alleged only one breach of the contract, the Ministry's 'failing and refusing to pay the Mobilization Fee and or consenting to the draw of the Mobilization Fee under the Letter of Credit'". But it observes that at the opening of the hearing, Claimant presented the Tribunal with an Amended Statement of Claim that specified five breaches of contract.  Claimant now maintains that, "The Award does not appear to address these alleged breaches".

9.   These alleged breaches however essentially relate to and turn upon the issue of the mobilization fee.   They are not independent breaches of contract that required separate consideration and disposition in the Award.   They are incidental to and subsumed by the treatment by counsel of the issue of the mobilization fee and equally are incidental to and subsumed by the Award's analysis and holding on this dispositive issue.  The Respondent now employs its discussion of what it advances as five distinct breaches of contract as a vehicle to re-argue

5

questions that were argued in the pleadings, and, in particular, at
the hearing.   These grounds were listed and discussed in the
Respondent's opening brief as elements of its argument that the
Ministry was in breach of the contract.  The Sole Arbitrator gave
those aspects of Respondent's position due consideration.   They
do not require reconsideration.

10.   In addition to maintaining that there are claims that
the Award did not address, the Respondent contends that the
reasoning of the Award requires clarification on three points.
However, a request for clarification should go to the meaning of
the Award, not to its reasoning; and the meaning of the Award is
clear.

11.   The Claimant in its "Conclusion" requests "a
reconsideration of this Award".   As the Sole Arbitrator
understands the International Arbitration Rules of the
International Centre for Dispute Resolution, reconsideration of an
award is not consistent with the finality and binding effect of
awards prescribed by Article 27(1) of the Rules.

FOR THE FOREGOING REASONS,

American Arbitration 5/11/2007 1:08:61 PM    PAGE    9/009    Fax Server

**The request of the Claimant for Completion and Clarification of**

**the Award of March 28, 2007 is denied.**

_____

**Stephen M. Schwebel**
**Sole Arbitrator**
**Washington, D.C.**
**May 3, 2007**

7

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------x
                               :

In the Matter of Arbitration Between:        :

VULCAN ENERGY SOLUTIONS, LLC,      :

                 *Petitioner,*     :

           - and -                :

MINISTRY OF ELECTRICITY OF THE    :
REPUBLIC OF IRAQ,                :

            *Respondent.*     :
---------------------------------------------------------x

Index No. *600897/08*
*Date Purchased : 3/26/08*

### MEMORANDUM IN SUPPORT OF
### PETITION TO CONFIRM ARBITRATION AWARD

In this proceeding under Section 7510 of the Civil Practice Law and Rules, and the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), Petitioner Vulcan Energy Solutions LLC ("Vulcan"), through its undersigned counsel, seeks an order from this Court to confirm a duly-rendered arbitration award (the "Arbitration Award," as further defined below) and to have judgment rendered thereon.

### PRELIMINARY STATEMENT

Petitioner Vulcan and Respondent, the Ministry of Electricity of the Republic of Iraq ("MOE"), entered into an agreement, pursuant to which Vulcan would refurbish several electricity-generating gas turbines at a power plant in Iraq. Shortly after the signing of the agreement, the MOE reneged, depriving the petitioner of the benefits of the contract. In the wake of this dispute, which included whether Vulcan was entitled to a mobilization payment, Vulcan initiated arbitration proceedings pursuant to the dispute provisions of the contract.

1

The arbitrator issued his arbitration decision, titled "Final Award of Sole Arbitrator," on March 28, 2007 (the "Final Award"). The arbitrator concluded that the contract was valid, but that Vulcan was not entitled to a mobilization payment. The arbitrator issued a subsequent decision on May 10, 2007, titled "Disposition of Application for Completion and Clarification of the Final Award" (the "Clarification Decision"), in which he denied Vulcan's request to clarify the Final Award. Vulcan now seeks to confirm the Final Award and Clarification Decision (collectively, the "Arbitration Award") pursuant to N.Y. C.P.L.R. § 7510 and have judgment entered thereon.

## BACKGROUND

The parties entered into an agreement, pursuant to which Vulcan would refurbish several electricity-generating gas turbines at the Mullah Abdullah power plant in Iraq. A copy of the Contract is attached as Exhibit A to the Affirmation of T. Michael Guiffré, dated March 25, 2008 (the "Guiffré Aff."), which is being filed concurrently herewith.

The Contract provided that the parties would use binding arbitration to settle any disputes arising out of the Contract. Specifically, the Contract provided:

> Any disputes arising out of this Contract shall be construed and interpreted according to the United States Law in the State of New York as applicable, excluding provisions thereof, which would refer to the laws of another body of law. In the event of a dispute, each party agrees to binding arbitration under the rules of the American Arbitration Association in New York, New York.

Exh. A § 23.0.

Pursuant to the arbitration clause, the parties engaged in arbitration hearings before a sole arbitrator in New York, New York on February 5-8, 2007. *See* Guiffré Aff., Exh. B ¶ 3. Before the hearings and over a period of several months, the parties exchanged documents, as well as submitted pre-hearing briefs and witness statements. During the hearings, the parties called

2

several witnesses, including some by way of video link to the Middle East. Following the hearings, the parties submitted post-hearing briefs. *See* Guiffré Aff., Exh. B ¶ 3.

On March 28, 2007, the arbitrator issued his Final Award. Guiffré Aff., Exh. B. In his Final Award, the arbitrator concluded, in relevant part, that:

> (A)    "[T]he [C]ontract cannot be set aside on the ground that it was procured by bribery." Guiffré Aff., Exh. B ¶ 30;
>
> (B)    The MOE "cannot now be heard to avoid the [C]ontract on the ground of the lack of authority of [its agent] to conclude it." *Id.* ¶ 33; and
>
> (C)    Vulcan did not establish "that the [MOE] was in breach of the [C]ontract by its treatment of payment of the mobilization fee." *Id.* ¶ 38.

On May 10, 2007, the arbitrator issued the Clarification Decision, holding that the Final Award was unambiguous and did not warrant reconsideration or clarification. *See generally* Guiffré Aff., Exh. C. Petitioner refers to the Final Award and the Clarification Decision collectively as the "Arbitration Award."

## ARGUMENT

This Court should confirm the arbitrator's Arbitration Award. This Court has both subject matter and personal jurisdiction over the MOE, and none of the statutory factors for vacating, modifying, or correcting the award exists here.

## I.    JURISDICTION AND VENUE ARE PROPER IN THIS COURT

This Court has subject matter jurisdiction over this proceeding to confirm the arbitrator's Arbitration Award pursuant to N.Y. C.P.L.R. § 7510 and the FAA. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith Inc. v. Kuang Ming Chan (In re Merrill Lynch)*, 38 A.D.3d 355, 355, 832 N.Y.S.2d 182, 182-83 (1st Dep't 2007) (affirming confirmation of arbitration award under the FAA). In addition to New York law, the FAA applies to this proceeding because the

3

arbitration concerned a written agreement involving interstate commerce. *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273-77 (1995) (giving broad reading to the "involving commerce" language in 9 U.S.C. § 2); *Specht v. Netscape Comms. Corp.*, 306 F.3d 17, 26 n.11 (2d Cir. 2002). The Contract between Vulcan and the MOE concerned an American company's refurbishment of several power generators within the Republic of Iraq. *See* Guiffré Aff., Exh. A.

This Court has personal jurisdiction over the MOE because the Contract provides that disputes are to be arbitrated in New York, New York. Guiffré Aff, Exh. A § 23.0; *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006) (upholding exercise of personal jurisdiction based on, *inter alia*, a forum-selection clause). In addition, the MOE participated in arbitration proceedings that included three days of hearings in New York City. *See, e.g., Naroor v. Gondal*, 17 A.D.3d 142, 142, 792 N.Y.S.2d 449, 450 (1st Dep't 2005) (affirming jurisdiction to confirm arbitration award where party's "full participation in the arbitration hearings" waived any claims of lack of jurisdiction); *Colavito v. Hockmeyer Equip. Corp.*, 605 F. Supp. 1482, 1486 (S.D.N.Y. 1986) (Defendant "participated fully in arbitration proceedings conducted within this district, and therefore may be deemed to have 'implicitly agreed' to the exercise of this Court's subject matter jurisdiction pursuant to § 9 of the Arbitration Act."); *Reed & Martin, Inc. v. Westinghouse Elec. Corp.*, 439 F.2d 1268, 1276-77 (2d Cir. 1971) ("Since the arbitration was lawfully held in New York City, the District Court in that district had jurisdiction to confirm the award.").

Because the arbitration was held in this county, venue is proper in this Court as well. *See* N.Y. C.P.L.R. § 7502(a)(i) ("The proceeding shall be brought in the court and county . . . where the arbitration was held."); *D.M.C. Constr. Corp. v. A. Leo Nash Steel Corp.*, 70 A.D.2d 635, 636, 416 N.Y.S.2d 649, 652 (2d Dep't 1979) ("CPLR 7502 (subd. (a)) . . . provides, in substance, that such proceedings may be brought . . . in a court in any county or in a court in the county

4

where the arbitration was held."), *appeal dismissed*, 49 N.Y.2d 1040 (1980). The hearings in this case were held in New York City, and the arbitrator issued his award decision in New York City. *See* Guiffré Aff., Exh. B ¶ 3. Venue is therefore proper in this Court.

## II.    THE ARBITRATION AWARD WAS LAWFULLY RENDERED AND SHOULD BE CONFIRMED

Confirmation of an arbitration award is "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984). It is well settled that a court must confirm a duly-rendered arbitration award under both the FAA and the C.P.L.R. *See* N.Y. C.P.L.R. § 7510 ("The court shall confirm an award upon application of a party made within one year after its delivery to him, unless the award is vacated or modified upon a ground specified in section 7511."); 9 U.S.C. § 9 (same under the FAA).

State and federal courts have repeatedly and emphatically held that review of arbitration awards is heavily circumscribed. *See, e.g., Wien & Malkin LLP v. Helmsley-Spear, Inc.*, 6 N.Y.3d 471, 479-80, 846 N.E.2d 1201, 1206 (N.Y. 2006) ("It is well settled that judicial review of arbitration awards is extremely limited. An arbitration award must be upheld when the arbitrator 'offer[s] even a barely colorable justification for the outcome reached.'") (internal citations and quotation omitted); *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993) ("Arbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation."); *Fairchild Corp. v. Alcoa, Inc.*, 510 F. Supp. 2d 280, 285-86 (S.D.N.Y. 2007) ("A court must grant an order to confirm an arbitral award upon a timely application, absent any of the specified improprieties."). None of the exceptions to confirmation

5

are applicable here. *See Wein & Malkin*, 6 N.Y.3d at 480-81, 846 N.E.2d at 1206-07 (reversing vacatur of arbitration award where none of the grounds specified in the FAA were present).

The parties agreed to arbitrate any dispute "arising out of [the] Contract" under U.S. law and in the State of New York. *See* Guiffré Aff., Exh. A § 23.0. The arbitrator was selected in accordance with the rules of the American Arbitration Association ("AAA") by the International Centre for Dispute Resolution. *See* Guiffré Aff., Exh. B ¶ 1 (process of selection); Guiffré Aff., Exh. A § 23.0 (requirement that the arbitrator be selected pursuant to AAA rules). During the arbitration, the parties exchanged documents, submitted pre-hearing briefs and witness statements, called witnesses during the hearing (including some by way of video link to the Middle East), and submitted post-hearing briefs. *See* Guiffré Aff., Exh. B ¶ 3. Moreover, the arbitrator held hearings from February 5-8, 2007 in New York City. *See* Guiffré Aff., Exh. B ¶ 3.

The arbitrator issued the Final Award in New York City on March 28, 2007. In his Final Award, the arbitrator concluded, in relevant part, that:

(A)    "[T]he [C]ontract cannot be set aside on the ground that it was procured by bribery." Guiffré Aff., Exh. B ¶ 30;

(B)    The MOE "cannot now be heard to avoid the contract on the ground of the lack of authority of [its agent] to conclude it." *Id.* ¶ 33; and

(C)    Vulcan did not establish "that the [MOE] was in breach of the [C]ontract by its treatment of payment of the mobilization fee." *Id.* ¶ 38.

The arbitrator subsequently determined in his Clarification Decision that the Final Award was unambiguous and did not warrant reconsideration or clarification. *See generally* Guiffré Aff.,

Exh. C.  Therefore, as the parties contractually agreed, the Arbitration Award is binding upon them and should be confirmed.

## CONCLUSION

For the foregoing reasons, Vulcan respectfully requests that this Court enter a judgment confirming the Arbitration Award in all respects.

Respectfully submitted,

Dated:  March 26, 2008
           Washington, D.C.

T. Michael Guiffré
Benjamin G. Chew
Cordell A. Hull
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C.  20037
(202) 457-6000 – Telephone
(202) 457-6315 – Facsimile

*Counsel for Petitioner*
*Vulcan Energy Solutions, LLC*

7